May it please the Court, in order to get their stents onto the market, Abbott lied to the FDA. We know that their misrepresentations and omissions were material, because but for Abbott's false statement of intended use as biliary, the FDA was legally prohibited by statute from clearing the stents onto the market, and without the clearance, CMS was legally prohibited from reimbursing Medicare claims for use of the stents. When the District Court dismissed the fraudulent inducement claim, based on a critical factual error, Mr. Colquitt proceeded to trial without the claim that best fit his case. And the dismissal of the court claim had a domino effect, leading to further errors that impacted the remaining claims. Here's how the District Court got off track. The District Court started at the right place, actually, with a ruling denying a motion to dismiss on Scienter. With regard to the fraudulent inducement claim, Scienter would be determined as of the time the false representation was made, and that would be in the five 10-case summaries to the FDA. Now, on appeal, Abbott has made a sweeping statement that Scienter would provide an alternative ground to affirm the court's dismissal of all the claims, of the fraudulent inducement, as well as rulings on false presentment, and the jury's verdict thereon. But in fact, Abbott has offered no authority or record support for the concept that there was a failure to plead Scienter or a lack of evidence in the court's examination of the original jurisdictional grounds. There's no allegation that there's any ambiguity in the legal requirements for what Abbott had to say in the 510-K. In the 510-K, the manufacturer of a medical device has to state an intended use and is no material fact is omitted. Now, Abbott stated the intended use for the stents was biliary, and the lie is not simply that, oh, they also intended that the stents be used for vascular procedures. It's that they didn't have an intent to have them used in biliary procedures. The evidence shows the stents were designed for vascular use. They were intended to be marketed for vascular use. They were solely marketed for vascular use. There was zero money spent on marketing the stents for biliary use. So it's not just that they had two intended uses and you picked one. It's that they didn't have the intended use that they gave, and they failed to disclose the other, the intended use they actually had. Well, Judge Lynn said it was publicly disclosed because the sizes were in the FDA submission. So why was that wrong? That was a factual error, Your Honor. If you look at her opinion, her memorandum opinion, she identifies the allegation in Mr. Colquitt's Third Amendment complaint. And she quotes it as depending on both the length and diameter of the stents and also the length of the pre-mounted delivery catheters. And then she says that Exhibit 1 to the Third Amendment complaint demonstrates that this information was publicly disclosed in five 10K summaries. There were three five 10K summaries in the record that Abbott provided. There were like 64 stents. They provided three. So what we're looking at here is Exhibit 1 and the three five 10K summaries. If you look at Exhibit 1, there's no catheter length in there at all, zero. It's basically a chart. And at the top of it, there are numerous categories of types of information that are provided in the five 10K summaries. And there's stent size and stent diameter, but there is no catheter length whatsoever. And if you look at the three five 10K summaries, which are at 1649 through 58 and 1673 through 577 of the record, you will not see any catheter length disclosed in the five 10K summaries whatsoever. I thought your complaint said that the FDA filing showed the sizes were incompatible with that use. The five 10K notices did contain more information. The five 10K notices that were presented to the FDA by Abbott. But the five 10K summaries are huge documents. And those five 10K notice, I'm sorry, five 10K notices are huge documents. And the notices themselves are not publicly disclosed. And Judge Lynn did not find that the notices were publicly disclosed. What she found were publicly disclosed, and I believe all that was really argued was publicly disclosed, were these five 10K summaries, which are basically two page, maybe three or four page summaries of this big huge document, selected information. And in the five 10K summaries, which was the public disclosure at issue in Judge Lynn's ruling, there's no catheter length whatsoever. And indeed, in one of the three, so in 33%, there's no stent size information. So in one of the three summaries, there's absolutely nothing from which you could figure out the truth that the stents were designed for vascular use. And in two of them, the critical piece is missing. What happened to the stents? What did they, did they, after they went on the market, and did the government later approve this for their use of the stents? No, Your Honor. These stents were never FDA approved. Abbott did later develop new, different versions of these stents, and rebranded them under the same names. And the FDA later gave approval to those newer, different designs. But these stents at issue in this case were never granted FDA approval. And if you look at Abbott's statement in their brief on that, and the record site that they give, it clearly refers to product lines, and it discloses that indeed these were newer, different designs in the same product line, not these stents that we're talking about today. So, it was actually not possible from the public disclosure to learn the truth, which is that these stents were designed for vascular use. They did not have an intended use of biliary. And therefore, the biliary use was a pretext, not simply a tagline. But is there, are there suggestions that, that there was evidence that, that the stents remained on the market, and that Medicare continued to pay for them? And that would actually not have anything to do with the fraudulent inducement claim, Your Honor. It has a lot to do with materiality. Actually it doesn't, and here's why. Escobar, among others. And under Escobar, here's why, and Longy, here's why it doesn't under either of those cases. Because CMS, Center for Medicare and Medicaid Services, cannot pay a claim for a stent that has not gotten onto the market legally. So a stent can't get onto the market legally unless it goes to the FDA. So if the stent is a vascular stent, it's going to have to be approved through the pre-market approval process. And the evidence in this record shows it could not have been approved through the pre-market approval process because Is it the case that Medicare, the government, what happens in these, in some of the quid tem actions, and the issue arises when, when they, the relator develops a theory of fraud, proves fraud, whatever, and the government says, oh, hum, and it continues to use the product. In those circumstances, the Supreme Court has told us that, that, that, while not determinative of, of, of, of materiality, it really goes a long way down that pathway. So that, so all I, I picked up on was the assertion that, that these stents that you say are, were, are being fraudulently peddled because of misuse, and, and were, were in fact continue to be reimbursed by the government, the government accepting this. So that's, that's. Now that's, I don't think, I don't recall that Judge Lynn raised that issue because she went off on the public disclosure thing, but I'm, I'm just jumping past that. I think there are two points to be made in response to that. And first is, this case needs to be distinguished from cases in which the allegation of the fraudulent inducement is a representation that had the possibility to influence what the government did, as opposed to a representation that had the truth been known, that government would have had no discretion but to make a different decision. So here, what you have is a situation where, had Abbott told the FDA that the intended use was vascular, under 21 U.S.C. 360E subsection A, the FDA would not have had discretion to clear it. I thought, I thought Medicare was reimbursing, I thought the assertion was that Medicare was reimbursing for the, the vascular use of these binary devices, stents. But the, the decision to reimburse was only a function of the fact that the stent was cleared onto the market. And the problem here is that for purposes of fraudulent inducement, if FDA can't clear it, and they can't approve it, it can't get on the market, and CMS can't reimburse for it. So the materiality is that but for the false statement, it can't get cleared onto the market. Without the clearance, CMS has no discretion. They cannot pay it. It's not a, it wouldn't be a CMS decision at that point of, in our discretion, do we want to pay it or do we not want to pay it? The only reason that CMS had any discretion in this case. The assertion was that after this, after this information was, what you say is fraudulent was, was public, and she finds it public, and then my question naturally comes from that. Well, if it's public, then, and the Medicare can, it's true that Medicare and the government continues to buy these things, reimbursement, they go where they, they, reimbursement is essentially the direct buying, that you have a, you run an escrow bar issue. Yeah, I'm sorry, what, what issue? You have a problem with materiality. Well, I think the materiality is taken care of by the fact that under Escobar, under Longie as well, if you, the, the materiality is going to be the chain of but for and foreseeable result. Where, where there's some discretion, yes? Move away from the jargon for a moment. Okay. I mean, it, it is simply that if the government knows of the claimed fraud, and it knows of the events which are there, certainly to be a fraud, and they nonetheless take the product and use it, and, and, and, and, and decline to do anything about it, that whether that's good policy or bad policy of, on the part of the government, the private relater can't estimate from proceeding into the fraud. Essentially, you're talking about fraud on the government, and, and if they say no, we Well, the problem there is that the government was doing something about it, and the government was saying, look, we don't want to cause a panic, basically. We don't want to cause public fear, and I think panic was the word that the FDA used in its PowerPoint in the closed door meeting with Abbott, but they said, look, this is, this is a huge problem, because here, here's the problem, here, here's one of the problems. If you go ahead into the class two pocket, okay, you are getting these stents out on the market without the clinical data to back it up, and you're also circumventing post-approval clinical studies that the FDA could do. By then encouraging off-label use, you're making it almost, you're making it very difficult for anybody to do a clinical study, because as the FDA says in the guidance in the record, once physicians are using something off-label a lot, it's difficult to get patients to enroll in a clinical study to see what the problems really are. Well, the suggestion is that there is a, there is a, there is a significant demand for these stents to be used in more in the capillary regions and some of the main arteries. But the In other words, the doctors want to use these, but they, they see particular needs for thrombosis and things in the legs and all these other kinds of medical usages of those stents, and they're using them. The need to use it does not justify circumventing this health and safety precautions the FDA has. And in addition to that, I think that just because it worked out this time does not mean it's going to work out next time. And we don't allow Medicare to pay for companies to do their experimentation in the field on human beings who don't know that they're part of a trial because they've decided, well, we've tried and we've failed to do these clinical trials. We can't get it past class three. We know that it's a high-risk stent. We know that, you know, cardiac stent or non-cardiac stents like this are in the body for 10 years, whereas biliary are only in the body for one to five. We know they have to deal with intense pressure in the arteries that biliary stents don't have to do. Let me ask you what the false presentment theory did go to the jury. Yes. Limited to about the two years when the court found him, the relator, to be an original source when he was actually working for the defendant. Yes. And you're arguing, well, we should have had some period before he worked there and after he worked there for which he was an original source. Even if you're right about that, what leads us to believe the jury verdict would have been any different? Because it seemed to me, from the record, the whole focus of the trial, somewhat similar to what Judge Higginbotham has been saying, was that, look, the government's been paying these. Everyone knows about it. So there's no materiality as to false presentment. So even if you're right about original source, what indication do you have that the result would have been any different if you could have covered more of a time period? Well, I think that two things would have made it different. First of all, increasing the time period would have shown more of the scheme that Abbott went through to circumvent the safety procedures and to basically do its experimenting on the public. And if you take that even further back to the fact that they designed these for vascular use and they lied to the FDA to get them on the market without going through that, I think that that would have... You think that didn't come in? The whole FDA approval process didn't come in? The jury was not asked to decide, did they... I know they weren't asked that, but didn't that come into evidence? That was just not a focus of the trial, Your Honor, and so I don't... Was it... Did it come into evidence? Did it come into evidence? Was it part of the record? There was not... There was evidence about the stents and their design, but I don't recall there being evidence that the FDA was defrauded into approving them and that the approval process was a ruse. There had to come in evidence because your whole theory was it was false because it was intended for this limited use but being used off-market, and it was being marketed for this off-label purpose. So you had to say it was the label purpose. The falsity was the fact that it was being coded as if it was a vascular stent, and it was not. It was a biliary stent. So, actually, the false presentment is on a different theory than the fraudulent inducement. The fraudulent inducement is basically saying, look, you guys said this was a biliary stent. It wasn't. It was a vascular stent, and that's a really huge problem for a variety of reasons that endanger the public, even if it turns out all right in the end. We don't want people going out and experimenting on patients as guinea pigs. That theory was never allowed in front of the jury. That was limited out, in fact, the whole idea of patients as guinea pigs. The false presentment claim, on the other hand, that was it's on the — it's cleared as a biliary stent. Right. But so even if the false presentment claim went back further in time, under what you're saying, it wouldn't allow you to get into this different fraudulent inducement theory. Not if just the pre- and post-employment were reversed, but if the fraudulent inducement were reversed. Oh, sure. But my question is just if the original source were reversed, what would be different on just on the false presentment? Well, I think that would go to our jury charge and our evidentiary exclusion points, that it's not just that — So if we find that the trial — there was no trial error, and the jury was within its discretion, there was no error tainting its decision to give a defense verdict, then it doesn't make a difference that some of the time period was excluded. Under the false presentment theory, I understand your other two theories got thrown out, too. No, I think if what you're — I'm sorry, and I apologize if I didn't understand the question. If all we're looking at, not fraudulent inducement, not the other issues, just pre- and post-employment, I think our position still is, yes, that would make a difference to a jury. Because in addition to the fact that it would show a broader scheme, we would be able to But we would be able to introduce a broader amount of evidence relevant to those pre- and post-employment periods, regardless of whether the judge appropriately excluded it under the circumstances that were tried. If we went back, those periods would be opened up, and instead of sort of having to decide whether we only wanted to introduce evidence that was unfavorable to us during those times, we could introduce evidence that was, you know, unfavorable to Abbott during those times. We feel the jury would make a different decision. What's good to hear your time is over, but one quick response to this question of what was your general damage theory? What were your damages that you saw? That was the amounts that the government paid in the false claims. The amount they paid for what? For reimbursing for those procedures that used the biliary stents and the vasculature. The Medicare payments. The Medicare payments. Thank you. Thank you. All right. Thank you, ma'am. You've preserved your rebuttal time. Thanks. All right. Mr. O'Quinn. Thank you, Chief Judge Stewart, and may it please the court, John O'Quinn, on behalf of Abbott, including as successor to Guyton. Judge Costa, I want to come back to the question that you asked, what would have been different if there had been a broader period of time at issue in front of the jury? At page 67 of our brief, we made the point that there's nothing that would have been different with the exception of the one letter that they have included in their appeal. They don't point to evidence that was excluded that they wanted to include, and in fact, evidence that was presented to the jury dated back to the 1990s. So it wasn't that this case was limited in terms of the evidence in front of the jury to the time period for which the district court had found him to be an original source. I also want to say there's some suggestion from counsel that their fraudulent inducement theory is wholly separate from what they presented to the jury, and that's actually not true. If you go back and look at their opening argument to the jury, the theme of the trial was that we tricked the FDA in order to get these products on the market. You can look at statements by counsel in the opening at ROA 5909 and 59948 in which they said we broke the rules, and then they brought an FDA expert, a former deputy commissioner of the FDA who testified at 6131 about what the FDA would have required if it had known. And then finally, if you look at the jury instructions themselves at 58307, the jury was allowed to consider whether there had been alleged violations of FDA rules in deciding whether or not there was a false claim here. So even though their fraud on the FDA theory was properly dismissed because of the public disclosure bar, they, in fact, were able to present much of that to the jury, and indeed, the jury heard a lot of that in this case. Now, the district... What about her response to my question on public disclosure when she said, well, this small number of the publicly disclosed documents the district court relied on actually didn't get into the size of the stints? Sure. No, I appreciate the question. Well, first, I would, I'll give you a couple of examples for how you know that their allegations depend on the information that was in the publicly disclosed 510Ks, and if you do a 883 to ROA 1655, 883 is their complaint, 1655 is one of the 510Ks, and it's the exact same measurement information that they are relying on with respect to that stint, and they themselves in the complaint allege that these dimensions, and in fact, I wrote it down, she said it here today, these stints were designed for vascular use, she says. That was their allegation, and they say that there was objective evidence of that from the stint length and the stint diameter. Now, on appeal, they've started to say something about catheter length. That wasn't an argument that they made to the district court, and I think it's belied. If you look at the chart that was the appendix to their complaint itself at 984 of the record, that chart doesn't say anything about catheter length. It goes and it looks at the length of the stint and the diameter of the stint, and then based on that, the chart says, was it designed for biliary, and they run down, you know, device by device, and the allegation is no as to each one. Now, I think part of also Judge Costa in answering her question, one of the things that they've complained about is that the district court reached this decision with only, according to them, three of the 510K summaries actually having been before the district court, and yes, these were all publicly available documents. They were provided to the district court as a representative sample with the understanding that others were available that were just like it, and in the district court, unlike what they argue on appeal, on a district court, what they said was not all the 510K summaries contained size information, including 510K summaries for two of Abbott stints. They say it's more now, but in the district court, they said it was two. That's an ROA 3032, but the two that they complained about in front of the district court were summaries that had been, where the 510Ks had been cleared as substantially equivalent to earlier prior guidance stints, and those earlier prior guidance stints disclosed the sizing information itself. That's at ROA 3051 and ROA 3044, and in any event, the test ultimately under the public disclosure bar is whether or not there's enough to put the government on the trail of a purported fraud. That's the test that this court has articulated in Reagan and in Freed, and whether or not the defendant's alleged misconduct would have been readily identifiable, and as the district court said, even with some of these stints having allegedly the improper sizing information, that is certainly enough on its face to publicly disclose what's allegedly a fraud here, and it's telling, of course, FDA at the time, in 1999, in which it cleared guidance stint, was fully aware that these were likely to be used in an off-label manner. In fact, it required a specific warning to go on the label that said that these had not been reviewed by the FDA for whether, for vascular use. And jumping forward in time and coming back to a question that Judge Higginbotham asked earlier on the issue of materiality, a couple of points. First, it's certainly the situation here where after all of the allegations in Relator's Complaint were laid bare and were known to the world, that CMS made the affirmative decision to continue reimbursing with respect to all of these products being used in these procedures. And actually, the jury heard about this. They heard from our expert, the former director of coverage of CMS, Dr. Bagley, who explained, number one, that CMS was aware that these stints were being used off-label at the time it was reimbursing. And number two, if CMS had wanted to prevent that, it absolutely could have done that by issuing an NCD. It did not. Moreover, in fact, in 2008, also again after the allegations have been laid bare, but also separate and apart from that, CMS issued a decision memo. You can find it at ROA 14297. And in that memo, CMS addressed renal stints in particular, which is a subset of the vasculature. And CMS specifically notes that even as of 2006, every single renal stinting procedure was being done with an off-label biliary stint. In fact, there were no on-label stints that were even being marketed at the time, as of 2006. And it made the express affirmative determination to make no change with respect to coverage. So there is certainly, with respect to any of the theories that have been presented here, whether it's their fraudulent inducement or really a fraud on the FDA theory, and with respect to the allegations of off-label marketing, for all of those, they have a materiality problem. They also have a scienter problem, as we've identified in the brief. How are those issues of materiality put to the jury, or were they? Well, I think, I mean, in some sense, they obviously were, Judge Higginbotham, in the sense that the question to the jury was... Maybe I assume, I haven't looked at your verdict form, but I assume some of that may be captured in the phrasing of the issue itself. Sure. Well, in fact, the verdict form is at ROA 58309, and the question, the first question, and indeed the only question that the jury ultimately had to answer here was, you know, considering the elements and definitions found above did relate or prove, by a preponderance of the evidence, the defendant's cause to be presented to CMS a false or fraudulent claim for payment or approval between February 23rd, 2004, and June 21st, 2006. I assume that the elements above include some statement of materiality. That's right. That's right, Judge Higginbotham. Which, to take a step back, the relator here would ultimately have to run the table. There are, in our brief, we've articulated any number of reasons why, for each of the theories that they have advanced, it's either controlled by the jury verdict, properly dismissed by the district court, or it simply could not state a claim. And I know we've spent . . . Well, let's talk about one of those theories that the other side, it's in our brief but she didn't mention it, the anti-kickback theory, that was our third theory. That was thrown out for pleading problems under Rule 9b. The Grubbs case, and I shouldn't try to summarize it because my colleague down at the other end wrote it, but it basically says to get past 9b, it recognizes that in these cases, unless you're in the hospital billing department, you're often not going to have knowledge pre-discovery of, you know, a claim was filed on this date and this amount. So it says you have to have particularity about the scheme, the fraud itself, combined with a sufficient basis for thinking that it resulted in claims being filed. Which, when you're dealing with Medicare, I mean, that's the whole reason these hospitals are doing business. So why isn't . . . why wasn't the scheme of kickbacks sufficiently alleged? I mean, they talked about these dinners, they talked about these, I guess, discounts for the number used. Why wasn't there a sufficient allegation on the kickbacks? Sure. I appreciate the question, Judge Costa. First, let's just look at what exactly we're talking about here. The allegations with respect to Abbott or Guidant involve two hospitals and one doctor. That's it, in terms of their anti-kickback statute claims. And while it is true that many healthcare providers provide to Medicare, it's certainly not true that all do. And Judge Lynn found, after looking carefully . . . Judge Lynn gave the relator the benefit of the doubt at almost every turn here, ultimately overseeing this case for 10 years and putting it in front of a jury. But she found in reviewing their complaint . . . she's a careful judge, and in reviewing their complaint, you can find this at 3027 of the record. She said there are no allegations in the third amended complaint that these hospitals or clients with the AKS is a condition of such participation. So the allegations here are . . . Well, hospitals don't participate in Medicare. I mean, it's the vast majority of hospitals. I know Medicaid's a whole other issue. A lot of people don't want to do Medicaid, but I thought Medicare's . . . I mean, that would mean you don't serve seniors, people over 65. And Judge Costa, I'm not going to parse what the allegations were with respect to . . . what . . . they filed six complaints over a seven-year period, and they did not allege these basic requirements. And they had the opportunity to. It was dismissed without prejudice, and they didn't. And for what . . . whether that's because they couldn't, consistent with Rule 11, or because . . . for other reasons, they simply did not. And the allegations . . . so I think that Judge Lynn, who was very careful in her administration of the case, was absolutely right to dismiss this. And if you go back and look at what they point to on appeal, they cite ROA 790. They cite ROA 911. Those are allegations about what Medicare requires, but they are not allegations about what these two hospitals or this one doctor actually did, either with respect to participation in Medicare or with respect to whether or not they had a false certification. Now Escobar says implied certification is generally valid as a theory. Sure. You can have an implied certification theory, but even then, under this Court's decision in Grubbs, you've still got to have, quote, particular and reliable indicia that false bills were actually submitted as a result of the scheme, such as the dates that services were fraudulently provided or recorded, by whom, and evidence of the department's billing standard billing procedure. None of that was alleged here. It is absolutely threadbare with respect to that. I mean, they don't — they at most depend on what would be statistical likelihood, and that's not enough for reasons that this Court articulated in the Thompson case. But even if you were to decide that, well, there's not a 9B issue here, there's a 9B issue. Have they plausibly alleged a violation of the anti-kickback statute, which has a knowing and willful component, and that can't be retroactively repealed? And the answer is plainly not. I mean, the allegations with respect to these two hospitals are simply that they — that there were some volume-based discounts. Now, there's no allegation that we knowingly induced these hospitals, assuming that they didn't seek reimbursement for the full amount, and you would have to have that in order for there to be a violation of the anti-kickback statute. And similarly, with respect — so this is the kind of legitimate business conduct that cases like Iqbal and Twombly talk about, that you can't just simply plead the conclusion when all you have is the fact that this conduct was engaged in, and on its face, there's nothing wrong with providing discounts. The same is true with respect to the one doctor, Dr. Kitasami. The allegations are absolutely generic about what guidance intent was. There's no allegation that there was ever a referral fee that was actually offered or that there was referrals. And the FDA permits modest meals, even where the parties there discuss unapproved uses. And we cite, of course, the Federal Register provisions in our brief. And so — and the same is true under the pharma guidelines that HHS has endorsed. And so when the allegation is that you have these two hospitals who received volume-based discounts and one doctor who had, you know, a dinner or two at the Capitol Grill, that is not enough to give rise to a plausible allegation under the anti-kickback statute, and certainly not to meet the knowing and willful requirement. I mean, again, the conduct that took place here is the antithesis of, you know, what you would think from somebody who thought that they were acting in violation of the law. This was happening, you know, with some of their competitors and with others. There was no — this was all happening in broad daylight. And so that's inconsistent with what the statute itself would require in order to make out a claim. You want us to affirm on the — or ask us to affirm on the alternative basis that there was no C-enter, essentially, which I think you're saying would just be an easier way of sort of getting rid of everything. But don't we — this is under the old statute, under which public disclosure bar was considered jurisdictional. It's since been amended, so it no longer is, but this is under the old statute. Don't we have to first consider the jurisdictional issue of public disclosure? So, Judge Costa, I agree that I think the rationale of Steele Co. would apply here. And so if there's a jurisdictional question that the court has to reach before reaching the merits, then yes, you'd have to — you'd have to decide that. Now, having said that, I think the C-enter question is in front of the court even setting aside the jurisdictional obstacle because there is the period of time for which the case actually went to the jury. And this is alternative grounds for affirmance with respect to that period of time. And I don't think that Steele Co. is so wooden that if the court were, you know, starting with that period of time to conclude that the C-enter requirement couldn't be met, the court would certainly have jurisdiction to make that determination. And I think that that could then be a basis for affirming the entire case. But I agree with you that Steele Co. is in play here, and that makes it slightly more complicated. I also want to just be clear. Our C-enter argument absolutely applies to the fraud on the FDA theory because the fraud on the FDA theory ultimately requires a presentment to CMS for payment. And the issue there would still be whether or not guidance knowingly caused stints to be used in procedures for which it knew that Medicare reimbursement was prohibited. And so I think the exact same C-enter issue applies under the fraud on the FDA theory. I'd also point out in the two minutes that I have remaining that the fraud on the FDA theory also runs headlong into the First Circuit's decision in D'Agostino, which came down shortly after we filed our opening brief. D'Agostino applied the rationale of the Supreme Court's decision in Buckman. Buckman itself was a 510k case. The arguments in Buckman, albeit under state law as opposed to the Faults Claims Act, were exactly the same arguments about but-for causation and the exact same arguments that you sought clearance under this provision, fully intending for it to be marketed for something completely different. And Buckman, of course, rejected that in preempting state law. And D'Agostino applies that rationale properly to the Faults Claims Act context, which gets back to the point that I made a moment ago, that a relator here really would have to run the table on all of these theories in order to prevail on anything on appeal. If the Court has further questions, I'm happy to answer those. Thank you, sir. Thank you. Any rebuttal? Thank you. At issue here is the integrity of the system, not how many people got hurt this time, but I think it is worth noting that at trial, Abbott's vice president of research and development testified that he had no idea how many people may have died within a year of receiving one of their biliary stents in the vasculature, and for that you'd have to do a clinical trial, which kind of proves our whole point about the fact that by circumventing the Class 3 premarket approval process and getting into Class 2, Abbott really has deprived us of the ability to say, and deprived CMS of the ability to say, how many people were dying, how many people were injured, how many people lost a leg. The post-approval study process that is generally required for vascular stents was not required of these biliary stents because it was Class 2 and not Class 3, and those post-approval studies have more stringent reporting requirements and more follow-up with patients that goes on for one to three years after the product hits the market. With that kind of information, CMS might have decided, look, regardless of public fear or fear, we're going to go ahead and cut this off now. But instead of doing that, what they decided to do, not until March of 2007, was to have a closed-door meeting with Abbott, and the PowerPoint appears at 71362-67, at least, of the record. And in that PowerPoint, we have the memorialization of what they talked about, which was that they wanted Abbott to stop promoting these stents for vascular use. They needed to warn their customers that serious adverse events, including death, occur when you use these biliary stents in the vasculature. And they would work with the industry to develop clinical trials, but they weren't just going to approve these things or turn a blind eye because they had gotten cleared improperly. And in fact, at that point, the FDA said, look, now that we know about all this, that happened after this lawsuit was filed, but now that we know about all this, we're not going to clear biliary stents anymore, regardless of whether they actually would be used in the biliary, because it's being subjected to too much abuse. Now fraudulent inducement would address this problem. And some of these stumbling blocks that I think occur when people try to wrap their head around a false presentment claim where the stents got so much off-label use. We still feel that we have a really strong false presentment claim, but the brutal truth is that had the stents not been cleared and put onto the market, CMS couldn't have reimbursed for it even if they wanted to. So the fraudulent inducement materiality is established. We don't, as in D'Agostino, have to go back and go behind the curtains and figure out whether FDA would have made the same decision regardless. And likewise, we don't have to go behind the curtain and see whether CMS would have made the same decision otherwise. Because we know that if they can't be cleared, if they're vascular, they can't be cleared, and without the clearance, they can't be reimbursed. And they couldn't get approved, which is why they lied in the first place. So we don't have the D'Agostino problem. We don't have a Ross-Tolder issue. We have a situation more like in Longy and was recognized in Gonzales that the materiality chain is established. Now I did hear my esteemed colleague concede that the chart at Exhibit 1 of the Third Amending Complaint doesn't say anything about catheter length. Indeed, it does not. That would be our point. If you look at the Third Amending Complaint, it sets up that both catheter length and stent size would have been necessary to discover the truth, that these stents were designed for vascular use. And this point was also made in the motion for hearing at SB 117, regard to our contention that the whole stent system had to be known in order to know that fact. With regard to the anti-kickback statute, if I might address that very quickly, we did in the Third Amending Complaint make allegations about hospitals and providers nationwide. It wasn't just two hospitals and one provider. There were allegations about programs that were offered nationwide, claims that were submitted by many more health care providers than just three. We didn't replete because we already had met the Grubb standard and we didn't feel that we could say anything more that would meet the different standard that the district court seemed to be applying. I think our pleading is consistent with the standard in Grubb and we feel that certainly from a 9B and a pleading standpoint, that claim should have gone to trial.